IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARLYN L. TALIAFERRO, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 10-459 |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) |

MEMORANDUM OPINION

CONTI, District Judge.

**I. Background**

On April 28, 2010, Marlyn Louise Taliaferro ("Taliaferro," "plaintiff," or "claimant") brought an action under 42 U.S.C. § 405(g) seeking judicial review of an adverse final decision of the Commissioner of Social Security ("Commissioner" or "defendant"). Plaintiff alleges that the administrative law judge ("ALJ") erred in finding that drug and/or alcohol addiction ("DAA") was a material factor in her disability and that she is entitled to a reversal of the ALJ's decision, or, in the alternative, that the case be remanded for further factual determinations regarding the materiality of plaintiff's DAA. The Commissioner asserts that the ALJ's decision should be upheld because the conclusion is supported by substantial evidence in the record. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil

Procedure.

**A. Procedural History**

On February 9, 2007, plaintiff applied for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-34 and supplemental security income benefits, under Title XVI of SSA, 42 U.S.C. §§ 1381-83f, alleging a disability onset due to "bipolar disorder and depression" on December 31, 1999.[1] (R. at 99-110 (ECF No. 5-4).) On June 12, 2007, the Social Security Administration ("SSA") sent a notice to plaintiff that her claims were denied. (R. at 71-80 (ECF No. 5-4).) Plaintiff made a timely request for a hearing, which was held before the ALJ on July 29, 2008. (R. at 89 (ECF No. 5-4).) Present at the hearing before the ALJ were plaintiff, her attorney and a vocational expert (the "VE"). (R. at 24-67 (ECF No. 5-2).) The ALJ issued a decision favorable to the Commissioner on September 3, 2008, claimant's subsequent request to the Appeals Committee was denied, and the appeal now comes before this court.

On February 14, 2011, the court heard oral argument. The parties agreed that the court must resolve two issues: (1) whether the ALJ erred in rejecting the stated limitation of plaintiff, i.e., the "marked" limitation, made by the consultative examiner ("CE"); and (2) whether the burden of proof regarding materiality of DAA shifts to the Commissioner or remains with the claimant.

**B. Factual Background**

Plaintiff was 52 years old at the time of the hearing before the ALJ. (R. at 32 (ECF No. 5-2).) She had prior work experience as a mail clerk, laborer, clerk and

---

[1] At the hearing, plaintiff amended her onset date to April 24, 2006. The ALJ noted that the "period at issue" for disability determination began with the amended onset date. (R. at 9 (ECF No. 5-2).)

security officer. (R. at 151-53 (ECF No. 5-6).)

On the amended disability onset date (April 24, 2006), plaintiff was admitted to the psychiatric ward at a University of Pittsburgh Medical Center facility ("UPMC Braddock") after pulling a knife on her boyfriend. The treating physician noted that plaintiff's substance use "probably triggered her recent violent behavior." (R. at 377, 380 (ECF No. 5-9).) Plaintiff spent approximately one week in the psychiatric ward at UPMC Braddock beginning on the date of her alleged disability onset, where she was examined and treated by Dr. Khairul Alam ("Dr. Alam"). (R. at 377-428 (ECF NO. 5-9).) Specifically, Dr. Alam noted that plaintiff had a record of "stabbing people in the past," pulling guns on people while intoxicated, and smoking $2,000 worth of crack cocaine in the weeks leading up to the incident that required her to receive treatment at UPMC Braddock. (*Id*.) At her discharge, Dr. Alam assessed a global assessment of functioning ("GAF") [2] score of 55, an increase of 30 points over plaintiff's GAF score upon admission. (R. 377, 382 (ECF No. 5-9).)

From May 3, 2006 to May 25, 2006, plaintiff was admitted to a rehabilitation facility called White Deer Run. (R. at 485 (ECF No. 5-10).) Barclay M. Wilson, Doctor of Osteopathic Medicine, and Darcie Hostetler, Certified Registered Nurse Practitioner,

---

[2] The Global Assessment of Functioning ("GAF") scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-TR) (4th ed. 2000). A GAF score between 51 and 60 indicates some "**[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational or school functioning** (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34 (emphasis in original). A score between 41 and 50 indicates "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." *Id.* (emphasis in original). A score between 21 and 30 indicates that **"[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home or friends)." *Id.* (emphasis in original).

examined and interviewed plaintiff at White Deer Run.[3] (R. at 489 (ECF NO. 5-10).)
Plaintiff's "Axis I diagnoses [were] cocaine dependence, alcohol dependence and bipolar
disorder." (R. at 14 (ECF No. 5-2), 489 (ECF NO. 5-10).) The records from the
rehabilitation facility shed light on the extent of the plaintiff's lifelong history of DAA.
(R. at 484 (ECF No. 5-10).) According to the report, plaintiff told the examining staff
that she began using alcohol at age sixteen, marijuana at age eighteen, and crack cocaine
at age thirty-six. (*Id*.) She used intravenous heroin for one year, and "ha[d] been
smoking tobacco for thirty four years." (*Id*.)

A letter from White Deer Run's medical records department to the Pennsylvania
Bureau of Disability Determination assessed a twenty-point increase, from 45 to 65,[4] in
plaintiff's score on the GAF. (R. at 658 (ECF No. 5-12).) The ALJ noted that the latter
number was indicative of only a "mild" psychological impairment, and found the
discrepancy was evidence of the plaintiff's inherent functionality versus her reduced
ability to function while abusing substances. (R. at 14 (ECF No. 5-2).)

Plaintiff did not exhibit any further substance abuse after June 2006. (R. at 15
(ECF No. 5-2).) From June 12, 2006 to December 21, 2006, plaintiff was a patient and
resident at The Turning Point at Washington rehabilitation center. (R. at 647 (ECF No.
5-12).) There, she completed two phases of the rehabilitation program, as well as
fulfilling the requirements of "community leader," and was involved in 12-step meetings.
(*Id*.) Patricia J. Lutz, M.Ed. ("Lutz"), wrote: "It is difficult for Marlyn to maintain a

---

[3] The ALJ stated that Dr. Wilson's examination occurred at Lincoln Lemington Health Care, but aside from this discrepancy in the name of the facility, the ALJ's account of the examination remains accurate.
[4] A GAF score between 61 and 70 indicates **[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**" American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-TR) 34 (4th ed. 2000).

4

normal life without medication, involvement in regular therapy and regular attendance at Alcoholics Anonymous." (*Id.*)

On April 13, 2007, plaintiff took part in a clinical psychological evaluation performed by Dr. Sandy Vujnovic ("Dr. Vujnovic"). (R. at 651 (ECF No. 5-12).) Dr. Vujnovic's Axis I diagnoses of plaintiff were bipolar disorder, not otherwise specified,[5] obsessive-compulsive disorder,[6] and a history of alcohol and cocaine dependence and abuse. (R. at 655 (ECF 5-12).) Plaintiff reported that she was "especially prone to excessive and aggressive behaviours [sic]" when she was using drugs. (R. at 652 (ECF No. 5-12).) Plaintiff offered a "somewhat rambling, inarticulate account" of what she meant by her uncontrollable actions and bipolar disorder. (R. at 651 (ECF No. 5-12).) On February 6, 2008, plaintiff was examined by Dr. Michael Malayil ("Dr. Malayil"). (R. at 887-88 (ECF No. 5-15).) This mental status exam revealed that plaintiff smoked "a few cigarettes a day," but had been otherwise "clean for two years." (R. at 877 (ECF No. 5-15).) She had periods of depression, but denied any suicidal or homicidal thoughts, and her "cognitive functions [were] fairly intact." (*Id.*) Her Axis I diagnoses were major depressive disorder, and "rule-out" bipolar affective disorder. (*Id.*) Dr. Malayil assessed plaintiff's GAF score at "about 60." (*Id.*) Plaintiff testified that she volunteered to play bingo with senior citizens four days each week. (*Id.*) She also enjoyed playing poker machines. "She also stated that she was a 'news watcher,' indicating her interest and involvement in current events." (*Id.*)

**C. ALJ's Decision**

---

[5] "This diagnosis can be amended if it can be determined that the mood disturbance is/is not substance-induced." (R. at 655 (ECF No.5-12).)
[6] "Trichotillomania appears ritualized and repetitive and so can be subsumed under this diagnosis, along with intrusive thoughts." (R. at 655.)

5

The ALJ incorporated Dr. Alam's findings into her own decision, noting that the April 24, 2006 incident was not plaintiff's first episode of violence in the context of her DAA. (R. at 380 (ECF No. 5-9).) The ALJ found that the diagnoses by Dr. Wilson and Darien Hasteller were evidence of plaintiff's DAA during the period at issue, at least in its first few months. (R. at 14 (ECF No. 5-2).) The ALJ noted that plaintiff had been smoking "$150 worth" of crack cocaine three times per week for the three months leading up to her admission to White Deer Run, and no evidence existed as to how her habit was financed. (R. at 14 (ECF No. 5-2), 484 (ECF No. 5-10).)

The ALJ determined plaintiff's statements during the examination by Dr. Vujnovic with respect to sustaining employment were self-serving and lacked credibility, especially when viewed in the context of plaintiff completing the "community leader" requirements in her rehabilitation program, and her regular volunteer work with the elderly. (R. at 20 (ECF No. 5-2).) The ALJ concluded, in part, that plaintiff's daily activities contradicated the presence of a compensable disability. (R. at 20 (ECF No. 5-2).) The ALJ noted playing poker machines as plaintiff enjoyed doing is "a hobby that requires concentration." (R. at 207 (ECF No. 5-2).)

At plaintiff's administrative hearing, the ALJ heard the testimony of the VE. (R. at 24 (ECF No. 5-2).) The VE testified that he was familiar with the jobs that exist in Pennsylvania and the national economy. (R. at 55 (ECF No. 5-2).) The VE reviewed plaintiff's work history for the past fifteen years. (R. at 56 (ECF No. 5-2).) Plaintiff held a job at the U.S. Postal Service for twenty years as a mail clerk; the job required heavy lifting and was semi-skilled. (*Id*.) She was then employed as a file clerk – a semi-skilled light job – at the University of Pittsburgh. (R. at 56-57 (ECF No. 5-2).) Plaintiff worked

as a security guard and then held various positions through a temporary placement agency, all of which were unskilled light or medium jobs. (R. at 57 (ECF No. 5-2).)

The ALJ posed a series of hypothetical questions regarding Taliaferro's residual functioning capacity ("RFC") to determine what occupations might be available. (*Id.*) The ALJ asked the VE to assume that Taliaferro could

> occasionally lift and or carry 20 pounds, 10 pounds frequently. To stand and or walk with normal breaks for a total of about six hours in an eight hour workday. To sit with normal breaks for a total of about six hours in an eight hour workday. To occasionally climb ladders, ropes or scaffolds. Occasionally climb ramps or stairs. Occasionally balance, stoop, kneel, crouch and or crawl.

(*Id.*) The ALJ asked the VE to add the additional limitations of "[a] sit, stand option throughout the day . . . [and] only occasional exposure to environment[al] irritants such as fumes, odors, dust and gases." (R. at 58 (ECF No. 5-2).) The ALJ limited plaintiff to only "occasional interaction with the public and or co-workers and the work place should be in a low stress environment" free from fast-paced production work. (R. at 59 (ECF No. 5-2).) "In addition, there should be no interaction or handling of drug or alcohol products." (R. at 60 (ECF NO. 5-2).) Regarding the above limitations, the VE concluded that Taliaferro could perform unskilled, light jobs, such as a housekeeper or laundry folder. (R. at 62 (ECF No. 5-2).) The VE concluded that there were at least 26,500 jobs in the two categories available in Pennsylvania and over three million jobs available in the two categories in the national economy. (*Id.*)

The ALJ found that plaintiff had the following medical conditions:

> Chronic sprain/strain of the cervical and lumbar spine, by report; shortness of breath, with 38-year history of tobacco abuse; history of enlarged heart on right side, with leaking valve; history of hypertension, controlled; history of

> positive hepatitis (B or C) status; history of goiter; history of hypothyroidism and follicular carcinoma, status post (August 2007) right-sided thyroid lobotomy and isthusectomy, and (September 2007) total thyroidectomy; moderate obesity; history of sarcoidosis; bipolar affective disorder; obsessive-compulsive disorder; and polysubstance (including alcohol, crack cocaine, intravenous heroin and marijuana) abuse disorder, in recent remission (20 CFR §§ 404.1520(c) and 416.920(c)).

(R. at 12 (ECF No. 5-2).) The ALJ found that plaintiff's ability to perform basic work activities was significantly limited. (R. at 15 (ECF No. 5-2).) She went through a period of more than twelve months during which she could not sustain substantial gainful activity. (*Id*.) Significant numbers of jobs existed in the national and regional economies that plaintiff *could* perform. (R. at 22 (ECF No. 5-2).) Plaintiff had limitations, but was no longer statutorily "disabled" because of the role DAA played in the twelve-month period during which she was unable to sustain "work" activity. (R. at 17 (ECF NO. 5-2).)

For at least twelve months during the period at issue, plaintiff was precluded from sustaining "substantial gainful activity." (R. at 15 (ECF No. 5-2).) Absent plaintiff's long history of DAA, the ALJ found that no such period of statutory disability would have existed. (Id.) Plaintiff's DAA was, therefore, a material factor in her disability.[7] (R. at 14 (ECF No. 5-2).)

**II. Legal Standard**

This court reviews the ALJ's decision under the substantial evidence standard. 42 U.S.C. § 405(g). Under this standard, a court may not reweigh the evidence or substitute its discretion for that of the Commissioner. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). Substantial evidence is more than a mere scintilla and less than a

---

[7] *See Westcott v. Astrue*, No. 10-78, 2010 WL 5419032, at *11 (W.D. Pa. Dec. 23, 2010) (there was "a high likelihood of a connection between the plaintiff's complaints of forgetfulness and poor concentration and

8

preponderance, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). If the ALJ's decision is supported by substantial evidence, then it cannot be set aside even if the court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

## III. Analysis

### A. The Disability Determination Process

The SSA has established a five-step evaluation process to be used in determining disability. 20 C.F.R. §§ 404.1520, 416.920. The five steps are as follows: (1) whether the claimant is or has been engaged in substantial gainful activity since the alleged disability onset; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) if so, whether the severe impairment or combination of impairments that is severe are, now or in the future, imposing symptoms of a severity that meet or medically equal the criteria listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairments prevent her from performing any vocationally relevant past work; and (5) if so, whether the claimant remains capable of sustaining any other types of work activity that exist in the national economy in light of her age, education, work experience, and residual functional capacity. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920. If the plaintiff does not carry her burden of proving the first four steps, then the administrative law judge may find the plaintiff not disabled. *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002). The

---

his substance abuse history").

Commissioner has the burden of proving the evaluation's fifth step. (*Id.*)

**B. Statutory Framework**

The Contract with America Advancement Act ("CAAA"), Pub. L. No. 104-121, 110 Stat. 847 (1996), amended the Act, specifically to proscribe an award of benefits under Title II or XVI to claimants whose alcoholism or drug abuse is a "contributing factor material to the determination of disability." 42 U.S.C. §§ 423(d)(2), 1382c(a)(3). An administrative law judge must determine whether the claimant would still be disabled if the substance abuse stopped. 20 C.F.R. §§ 404.1535, 416.935.

The legislative history for two parts of the CAAA reflects the reasons for the amendment. The previous law resulted in "a perverse incentive that affronts working taxpayers and fails to serve the interests of addicts and alcoholics, many of whom use their disability checks to purchase drugs and alcohol and thereby maintain or depend their addictions." H.R. REP. NO. 104-81, pt. 1, at 47 (1995), and "[t]he number of SSI recipients whose alcoholism or drug addiction is a contributing factor material to their disability has grown from 5,000 in 1985 to 101,000 in 1994. Costs have risen from $14 million in 1985 to $433 million in 1994." S. REP. NO. 104-96, at 15 (1995). The Act provided an incentive to alcoholics and drug addicts to remain unemployed "by providing them with cash payments so long as they do not work." (*Id.*)

**C. The Burden of Proof**

Plaintiff cites an internal SSA document, EM-96200 (the "teletype"), for the proposition that the ALJ incorrectly placed on her the burden of proving DAA nonmateriality. (*See generally* Pl.'s Br. at 6 (ECF No. 9).) One district court read the teletype as clarifying "that a *claimant can meet the burden of proving DAA immaterial* by

proving that it is impossible to segregate the effects of DAA from the effects of other, non-DAA impairments." *Ambrose v. Astrue*, No. 07-84, 2008 WL 648957, at *4 n.3 (D. Me. Mar. 5, 2008) (emphasis added). The Court of Appeals for the Ninth Circuit has repeatedly eschewed arguments based on such documents, stating that as mere internal agency memos, they do not carry the force of law and a court must not consider allegations of their noncompliance. *See, e.g., Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003); *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000).

The Court of Appeals for the Third Circuit has not directly addressed the import of the teletype on the burden of proof. This court, however, need not predict how the court of appeals would resolve the issue because even accepting plaintiff's contention that the teletype places the burden of proof for showing nonmateriality of DAA on the Commissioner, the ALJ's decision that DAA is material to the claimant's disability is supported by substantial evidence in the record. The ALJ need not specifically mention the teletype, as the law requires only that an ALJ's conclusion be supported by substantial evidence in the record. *See Salazar v. Barnhart*, 468 F.3d 615, 624 (10th Cir. 2006) (the failure to mention the teletype itself is not fatal to an administrative law judge's decision). Plaintiff confuses the burden of proof with the overall decision-making role of the ALJ, who considers the evidence from which she makes the ultimate findings of fact, concerning whether DAA is material to the claimant's disability.

**D. Dr. Vujnovic's Testimony**[8]

Plaintiff relies on Dr. Vujnovic's report for the proposition that the ALJ improperly discounted Dr. Vujnovic's finding that plaintiff had a "marked" limitation "to

---

[8] Dr. Vujnovic was the consultative examiner for purposes of the Commissioner's initial disability determination.

respond appropriately to work pressures in a usual work setting." (R. at 656 (ECF No. 5-12).) Plaintiff urges this court to conclude that, even after her drug use ceased, she remains unable to work. Plaintiff, however, overemphasizes the weight of this evidence. The "marked" limitation observed by Dr. Vujnovic is recorded in a form report, requiring him only to answer a multiple choice question. (*Id*.) The Court of Appeals for the Third Circuit has stated: "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

Even if Dr. Vujnovic's report is not considered a form report, because it is accompanied by a written assessment and qualified with a hand-written notation, the record still contains substantial evidence that permitted the ALJ to discount the opinion of Dr. Vujnovic. The opinions of two other physicians, taken in context of the claimant's own testimony, are sufficient to warrant the ALJ's discounting of Dr. Vujnovic's report. *See Bembery v. Barnhart*, 142 F. App'x 588, 591 (3d Cir. 2005). If a physician's explanations about the extent of a claimant's disabilities are unclear, and run contrary to almost all other medical testimony in the record, an administrative law judge can properly discount that physician's opinion. *See Norris v. Barnhart*, 82 F. App'x 285, 286 (3d Cir. 2003).

Here, Dr. Vujnovic's report, where "marked" is circled on a pre-printed form, contains a hand-written statement at the bottom that reads: "Claimant describes chronic irritability and difficulty in controlling anger and aggressive impulses towards others. These symptoms *may* interfere with interactions in a work setting." (R. at 656 (ECF No. 5-12)) (emphasis added). Dr. Vujnovic's use of qualifying language when he made this

handwritten statement controverts his assertion of a presently occurring, all-encompassing, "marked" limitation. His accompanying report states that plaintiff's "periods of increased irritability, physical aggression and excessive energy . . . have been especially pronounced while under the influence of alcohol and cocaine." (R. at 654 (ECF No. 5-12).) This caveat, which addresses the debilitating effects of claimant's DAA, contradicts Dr. Vujnovic's assertion that plaintiff remains disabled despite her discontinued use of drugs and alcohol.

Dr. Vujnovic's finding of a "marked" limitation carried little evidentiary value in the ALJ's decision. The court finds the ALJ did not err in affording little weight to that finding because there is a sufficient record consisting of medical professional and physician opinions and diagnoses – Lutz and Dr. Malayil -- which support the discounting of the weight of Dr. Vujnovic's opinion.

During her admission to UPMC Braddock, plaintiff was treated and assessed upon admission and discharge by Dr. Alam. (R. 377-82 (ECF No. 5-9).) At her discharge, Dr. Alam assessed a GAF score of 55, an increase of 30 points over plaintiff's GAF score upon admission. (R. 377, 382 (ECF No. 5-9).) Dr. Alam stated in plaintiff's discharge report that alcohol and cocaine use "probably triggered" plaintiff's violent episode that preceded her admission to UPMC Braddock. (R. 377 (ECF No. 5-9).) While the parties concede that this episode took place during a period of substance abuse by the plaintiff, the record provides ample examples of physicians' assessments during time periods when plaintiff's drug use ceased. The opinions of Lutz and Dr. Malayil bolster defendant's position that substantial evidence supports the ALJ's conclusion of DAA materiality.

Lutz assessed plaintiff while she was at The Turning Point in the Washington

rehabilitation center, noting that during rehabilitation, plaintiff stabilized on her medications, completed the requirements in the rehabilitation program to achieve the status of community leader, and became involved in a 12-step program. (R. at 647 (ECF No. 5-12).) Lutz stated: "It is difficult for Marlyn to maintain a normal life without medication, involvement in regular therapy and regular attendance at Alcoholics Anonymous." (*Id.*) This assessment supports the ALJ's conclusion that Lutz left open the opportunity for plaintiff to maintain a functioning life so long as she adheres to structural support programs and maintains sobriety.

The ALJ relied on Dr. Malayil's February 6, 2008 assessment. (R. at 20-21 (ECF No. 5-2).) The ALJ noted that Dr. Malayil assessed plaintiff's GAF score at 60,[9] with her cognitive functioning fairly intact. (R. at 21 (ECF No. 5-2).) In light of that evidence, the ALJ did not err in concluding that plaintiff had no disabling limitations. There is sufficient evidence in the record to justify the ALJ's discounting of the sole notation by Dr. Vujnovic of a "marked" limitation.

E. The Necessity of a Structured Environment

At oral argument, plaintiff's counsel contended that one or two increases in GAF scores are not dispositive, claimant's increases in GAF scores occurred at times when she was in a hospital or rehabilitation facility, and these structured environments are necessary for the claimant to remain functional. Plaintiff's counsel asserted that claimant is disabled because she cannot function outside these highly structured environments.

The evidence in this case, however, shows that plaintiff's significant increases in

---

[9] A GAF score between 51 and 60 indicates some "**[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational or school functioning** (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-TR) 34 (4th ed. 2000) (emphasis in

GAF scores coincided with a period of sobriety. Those scores are corroborated by testimony in the record from medical professionals that plaintiff's ailments were either caused or significantly made more severe by DAA. Medical evidence showed that plaintiff could lead a normal life so long as she avails herself of a solid support structure, including Alcoholics Anonymous meetings and other groups. For example, Lutz wrote that it would be difficult for plaintiff to maintain a normal life without this support structure, and she explained that Taliaferro can lead a normal life so long as she stays true to this support regimen and avails herself of the appropriate medical and social resources. The medical records technician from White Deer Run rehabilitation center compiled and submitted claimant's records, summarizing: "Her prognosis is fair *if she follows through with recommendations and aftercare*." (R. at 658 (ECF No. 5-12)) (emphasis added).

Neither the objective medical evidence of record nor the medical opinions support plaintiff's contention that because she needs a structured environment she is disabled. Plaintiff attempts, albeit indirectly, to argue that her GAF score increases upon leaving treatment facilities show that she is unable to function outside those structured environments. The record does not support this assertion. *See McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002) (the administrative law judge improperly relied upon on a physician's report because the evaluation only occurred in a structured environment *and* the physician did not express an opinion on the nature of the claimant's "cognitive abilities were she to be in an independent work environment"). Weighing the medical testimony of record, the ALJ did not err in concluding that plaintiff must maintain sobriety and avail herself of medical and social support structures in order to remain a functional member of society.

---

original).

The ALJ determined that, in part, plaintiff's daily activities contradicted the presence of a compensable disability. (R. at 20 (ECF No. 5-2).) Plaintiff testified that she volunteered to play bingo with senior citizens four days each week. (*Id.*) She also enjoyed playing poker machines, which the ALJ noted is "a hobby that requires concentration." (*Id.*) "She also stated that she was a 'news watcher,' indicating her interest and involvement in current events." (*Id.*) These are not the activities of an individual requiring a structured environment. *See Runkey v. Comm'r of Soc. Sec.*, 288 F. App'x 26, 28 (3d Cir. 2008) ("Furthermore, [claimant] himself testified that he was able to go grocery shopping, cook, and volunteer at a food bank.").

## IV. Conclusion

Substantial evidence exists in the record justifying the ALJ's discounting of the sole mention of a "marked" limitation by an examining physician. Other medical evidence showed that claimant had either no significant limitation or a minor limitation in any particular area. Under these circumstances, summary judgment must be granted in favor of defendant and against plaintiff. An appropriate order will be entered.

/s/JOY FLOWERS CONTI

Joy Flowers Conti
United States District Judge

Date: May 23, 2011